**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 1:14-cv-03451-CMA-CBS

CARLY BOUDREAU,

      Plaintiff,

v.

BETHESDA FOUNDATION OF NEBRASKA,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY
JUDGMENT**

---

This case involves claims that Defendant Bethesda Foundation of Nebraska
violated Plaintiff's rights under the Americans with Disabilities Act ("ADA") and the
Colorado Americans with Disabilities Act ("CADA").  This matter is before the Court on
Defendant's Motion for Summary Judgment.  (Doc. # 29.)

## I.    **BACKGROUND**

Defendant is a faith-based, non-profit organization operating facilities in the
senior living industry.  Defendant owns and operates sixteen senior living and senior
care communities in six states, including Colorado.  ViewPointe Senior Living
Community ("ViewPointe"), a facility in Colorado Springs, is owned and operated by
Bethesda Senior Living Communities ("BSLC"), a division of Defendant.

In May of 2013, Plaintiff was hired for a housekeeping position at ViewPointe. (Doc. # 29 at 2.)  On May 30, 2013, Plaintiff received and read ViewPointe's Employee Manual, which included an ADAA Accommodation provision: "[Defendant] will make reasonable accommodation for qualified individuals with known disabilities unless in doing so would result in an undue hardship to the company.  Employees needing such accommodation are instructed to contact their supervisor or Executive Director of Resources immediately."  (Docs. ## 29–7 at 3; 29–5 at 45–6.)  At the time of Plaintiff's employment, the housekeeping supervisor was Al Austin and the Executive Director was Elizabeth Henricks.  (Doc. # 29 at 3.)

On Plaintiff's first day of work, May 31, 2013, Mr. Austin assigned Plaintiff to work with Terri Montague, ViewPointe's most tenured lead housekeeper, for training.  (*Id.* at 3–4.)  On Plaintiff's second and last day of work, June 3, 2013, Plaintiff was again assigned to work with Ms. Montague and worked two to four hours.  (*Id.* at 4.)  At some point during the morning of June 3, 2013, Plaintiff left Ms. Montague's presence and did not return.  (*Id.*)

Plaintiff attempted to "get ahold of [Mr. Austin] at the front desk," but Mr. Austin was unavailable, thus, she left her walkie-talkie and housekeeper keys with a secretary and left the premises.[1]  (*Id.* at 5.)  Around 10:00 a.m. the same day, Mr. Austin was alerted to Plaintiff's departure and called Plaintiff to find out what happened.  (*Id.*)

---

[1] On June 3, 2013, Mr. Austin was on his way to Omaha, Nebraska for work.  (Doc. # 29 at 4.) The walkie-talkie and housekeeper keys, both company property, were "turned-in every single day when [a housekeeper] left the premises."  (Doc. # 29–5 at 104.)

Plaintiff's mother answered the phone and spoke to Mr. Austin for approximately ten

minutes.  (*Id.*)  In describing the phone call, Plaintiff's mother stated:

> He identified himself as Al, I identified myself for who I was, and I
> explained that I was taking the call for Carly because she was too upset to
> handle the call herself.  I explained to Al what had happened, that—I
> started off by explaining Carly's need for Teri to take the time to explain to
> Carly how she was cleaning the rooms, and I explained that, because of
> the way that Teri was training Carly, the way that she was training Carly
> without using enough descriptors and without working slowly enough for
> Carly to be able to see what was being done, that Carly needed more
> interaction that was of the helpful variety rather than telling her not to have
> sex with residents.
>
> So I explained to Al that Carly was something like high-functioning
> autistic and that Carly had explained that with her stress level as it went
> up, that her tics increased, and the way that Teri was interacting with her
> was not helpful.  So Al indicated—he used words that Teri was gruff and
> he could see how what happened could have happened.

(Doc. # 29–12 at 105:4–16.)  When asked what accommodation she asked Mr. Austin

for, Plaintiff's mother stated:

> A. I explained that Carly needed interaction that was helpful for training
> her and she needed respectful interaction that didn't berate her for her
> disability.
>
> Q. Is that it?  Anything else?
>
> A. Yeah, that was pretty much it.  I mean, she had six weeks to train.  So
> being slow was really not a big deal.  You would expect a new hire to be
> slow.  She expected herself to be slower than Teri.  So I didn't say, Oh,
> she needs twice the time to clean this room.  I didn't say anything like that,
> because, really, the accommodation she needed was just general
> decency from another person to train her with words that were helpful,
> like, Use this cleaner for this job, or to help her level set to say, Okay, this
> is clean enough.  That's not a huge accommodation.

(*Id.* at 109:10–24.)  Plaintiff's mother described Plaintiff's interaction with Ms.

Montague as "an interactive problem with the way that Teri was behaving toward

Carly because of Carly's disability."  (*Id.* at 110:8–14.)  When asked to relay how

Mr. Austin responded, Plaintiff's mother stated:

> A. He told me to tell Carly to, sit tight – those were his words – sit tight
> until I get back on Friday.  He did not tell me where he was going or why
> he was going, just that he was boarding a plane, and I could hear the
> sounds of the gate.
>
> Q. What else did he say?
>
> A. Sit tight until I get back, we'll resolve it.

(*Id.* at 106:4–10.)  Plaintiff never personally made a complaint of any kind directly

to Mr. Austin or Ms. Henricks.  (Doc. # 29–5 at 112:11–113:12.)

After the telephone call between Mr. Austin and Plaintiff's mother, Plaintiff

never returned to ViewPointe.  (Doc. ## 1 at 7, 29 at 7.)  Defendant claims

Plaintiff's early departure was interpreted as abandonment or self-termination.

(Doc. ## 29–2 at 53:3–5, 29–3 at 32:13–15)  Plaintiff asserts that she was

following Mr. Austin's instruction to "sit tight" until his return, and did not believe

that she quit her job when she left work early.  (Doc. ## 1 at. 7, 29–5 at 129:19–

22.)

Plaintiff claims that she called Mr. Austin on Friday, June 7, 2013, the day

he indicated he would return to work.  (Doc. # 1 at 8.)  She intended to discuss

"her work situation and next steps."  (*Id.*)  Plaintiff further claims that Mr. Austin

answered her call, and immediately informed her that she was terminated for her

unauthorized departure from work.  (*Id.*)

On or about December 3, 2013, Plaintiff filed a charge of disability discrimination and retaliation against Defendant concerning the circumstances of her brief employment at ViewPointe.  (Doc. # 29–13.)  On December 22, 2014, Plaintiff filed the instant suit bringing eight claims under the ADA and the CADA, specifically alleging Defendant's unlawful failure to accommodate her disability, wrongful termination, unlawful retaliation and unlawful harassment.  (Doc. # 1.)  Plaintiff alleges the following incidences of harassment by Ms. Montague during her two days of employment with Defendant:

- Ms. Montague told Plaintiff that her disability was "all in her head."
- Ms. Montague told Plaintiff she should "get off pills" and that Ms. Montague would "fix" her.
- After Plaintiff disclosed her Tourette's Syndrome, Ms. Montague asked questions like "Does that mean you say 'shit' and 'asshole' all the time?"
- After learning of Plaintiff's anxiety disorder, Ms. Boudreau jumped up and down in the elevator to make it shake.
- Ms. Montague denied Plaintiff's requests for more direction regarding Ms. Boudreau's work duties and expectations.

(Doc. # 1 at 5–6.)  On September 1, 2015, Defendant filed a motion for summary judgment on all of Plaintiff's claims.  (Doc. # 29.)  On September 22, 2015, Plaintiff filed her response (Doc. # 31), to which Defendant replied on October 6, 2015 (Doc. # 32).

## II.   **<u>STANDARD OF REVIEW</u>**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it is essential to the proper

disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671.

"To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

When interpreting state statutes, Colorado courts look to federal elements of proof in employment discrimination cases, especially where, as here, the language of the state statute closely parallels that of its federal counterpart. *See Colorado Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997). In this case, the four ADA claims asserted by Plaintiff are paired with four substantially similar claims brought under the CADA. This Court's analysis will address each couplet together, using the elements of proof enunciated in federal law to evaluate Defendant's motion for summary judgment.

## III.   **DISCUSSION**

### A.   **PLAINTIFF'S SECOND AND SIXTH CLAIMS: FAILURE TO ACCOMMODATE A DISABILITY IN VIOLATION OF THE ADA AND CADA**

To establish a prima facie case of failure to accommodate in violation of the ADA, Plaintiff must show: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability. *Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 836 n.4 (10th Cir. 2011) (citing *Kotwica v. Rose Packing Co., Inc.*, 637 F.3d 744, 747–48 (7th Cir. 2011)). Defendant argues in its motion for summary judgment that Plaintiff never brought any disability to the attention of her supervisor and failed to request any accommodations, suggesting no facts have been set forth sufficient to create a genuine dispute with respect to elements two and three of the "failure to accommodate" standard. (Doc. # 29 at 10.)

This Court disagrees and concludes that the record contains disputed facts sufficient to raise triable issues with respect to Defendant's knowledge of Plaintiff's disability and its alleged failure to provide reasonable accommodation.

To facilitate the reasonable accommodation of employees with disabilities, "[t]he federal regulations implementing the ADA envision an interactive process that requires participation by both parties." *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998); 29 C.F.R. § 1630.2(o)(3).  Typically, this interactive process begins with an employee providing notice to her employer of a disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job.  *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir.1999).  An employee "need not use magic words," but "must convey to the employer a desire to remain with the company despite his or her disability and limitations."  *Id.* (citing *Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142 (3d Cir. 1999)); *see also Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir.1998) ("A request as straightforward as asking for continued employment is a sufficient request for accommodation."); EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act, 1999 WL 33305876, at *4 ("To request accommodation, an individual may use 'plain English' and need not mention the ADA or use the phrase 'reasonable accommodation.'").

"Once the employer's responsibilities within the interactive process are triggered by appropriate notice by the employee, both parties have an obligation to proceed in a reasonably interactive manner . . . ."  *Midland Brake*, 180 F.3d at 1172.  While "[t]he

exact shape of this interactive dialogue will necessarily vary from situation to situation and no rules of universal application can be articulated[,]" "[t]he interactive process includes good-faith communications between the employer and employee." *Id*. at 1172–3. "Neither party may create or destroy liability by causing a breakdown of the interactive process." *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004); *see also Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) ("A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.").

In addressing Defendant's notice of Plaintiff's disability, the parties focus primarily on the phone conversation between Plaintiff's mother and supervisor Al Austin.[2]  Defendant argues that no facts exist suggesting that Plaintiff or Plaintiff's mother ever notified Defendant of a disability or requested reasonable accommodation. After reviewing the record in the light most favorable to the Plaintiff, this Court finds a genuine dispute of fact with respect to Defendant's knowledge of Plaintiff's disability.  In her deposition, Plaintiff's mother relates her telephone conversation with Al Austin. (Doc. # 29–12 at 110–11.)  She described to Mr. Austin "an interactive problem" between Plaintiff and the employee conducting her training and explicitly referenced her daughter's "disability."  (*Id*.)  Specifically, she characterized her daughter as "something

---

[2] For the purposes of this analysis, it is wholly irrelevant that Plaintiff's mother -- and not Plaintiff personally – advised Al Austin of her daughter's disability and requested accommodation.  Under EEOC Guidelines, "a family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability."  EEOC Enforcement Guidance at *4.

like high-functioning autistic." (*Id*.)  She also indicated that anyone training Plaintiff

would need to work slowly and use appropriate descriptors. (*Id*. at 105:7–16.)  While

the Court believes this testimony alone is sufficient to demonstrate a dispute of material

fact on the element of notice, Plaintiff also points to Defendant's own internal

investigation, wherein Al Austin acknowledges he knew of Plaintiff's disability **prior** to

his conversation with Plaintiff's mother.  (Doc. # 31–3 at 111.)  After reviewing the

record, this Court concludes Defendant's knowledge of Plaintiff's disability is a matter in

legitimate dispute.

Assuming *arguendo* that Plaintiff properly notified Defendant of her disability and

requested reasonable accommodation, Defendant argues there are no disputed facts

with respect to its alleged failure to accommodate, because the request for

accommodation came after Plaintiff voluntarily quit her job.  (Doc. # 32 at 7.)  This Court

disagrees.  The facts in the record concerning the status of Plaintiff's employment

following her early departure from work are unclear.  Defendant asserts its belief that

Plaintiff quit.  (Doc. ## 29–2 at 53:3–5, 29–3 at 32:13–15)  Plaintiff asserts her belief

that she was still employed, and simply following Mr. Austin's instruction to "sit tight"

until his return.  (Doc. ## 1 at. 7, 29–5 at 129:19–22.)  Viewing the evidence in the light

most favorable to Plaintiff, this Court presumes Plaintiff did not intend to abandon her

employment.  This Court further presumes that Plaintiff's mother initiated an "interactive

process" when she relayed her daughter's disability to Mr. Austin and requested

accommodation.  This Court finally presumes that less than a week after Plaintiff's

mother initiated an "interactive process," Mr. Austin terminated Plaintiff when she called

to discuss "her work situation and next steps."  (Doc. # 1 at 8.)  Plaintiff has alleged

facts suggesting Defendant responded to the initiation of an interactive process by

terminating its employee, a move clearly at odds with an employer's duty to engage the

interactive process in good faith.  Consequently, this Court concludes the issue of

Defendant's failure to reasonably accommodate Plaintiff's disability is in dispute.

Because Plaintiff sets forth specific facts demonstrating genuine disputes on the

issues of Defendant's knowledge of Plaintiff's disability and Defendant's failure to

provide reasonable accommodation for a known disability, this Court declines to grant

Defendant's motion for summary judgment on Plaintiff's second and sixth claims for

failure to accommodate a disability in violation of the ADA and CADA.

**B.     PLAINTIFF'S THIRD AND SEVENTH CLAIMS: WRONGFUL TERMINATION IN VIOLATION OF THE ADA AND CADA**

If an individual has a protected disability, she may establish a prima facie case of

discriminatory discharge under the ADA by demonstrating that: (1) she was qualified,

with or without reasonable accommodation, to perform the essential functions of her job;

and (2) her employer terminated her employment under circumstances giving rise to an

inference that the action was based on her disability.  *Selenke v. Medical Imaging of

Colorado*, 248 F.3d 1249, 1259 (10th Cir. 2001) (citing *Morgan v. Hilti, Inc.*, 108 F.3d

1319, 1323 (10th Cir. 1997)).  To establish the second element, a plaintiff must submit

some affirmative evidence that her disability was a determining factor in the employer's

decision.  *Id*.  The burden is "not onerous," but it is also "not empty or perfunctory."  *Id*.

If a plaintiff establishes a prima facie case of discriminatory discharge, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the termination. *See Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 747 (10th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant articulates a legitimate reason for terminating the plaintiff's employment, establishing a prima facie case is not sufficient to avoid summary judgment. *Selenke*, 248 F.3d at 1260. Instead, the plaintiff must then offer evidence that the defendant's proffered reason is a pretext for discrimination. *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1396 (10th Cir. 1997) (stating that "even though a plaintiff has established a prima facie case, the defendant is entitled to summary judgment unless the plaintiff produces either direct evidence of discrimination or evidence that the defendant's proffered reason for the action taken is pretextual"). "[A] plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'" *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (alteration in original) (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008)).

When evaluating a contention of pretext, this Court must assess the facts "as they appear to the person making the decision to terminate [the] plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000). This Court will not second guess the business judgment of the employer. *Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.

1999).  The relevant question is always whether the reason articulated by the employer was the true reason for the termination.  *Selenke*, 248 F.3d at 1261.

As a threshold issue, Defendant again asserts that it did not terminate Plaintiff, a fact which would necessarily defeat a claim for wrongful discharge.  (Doc. # 29 at 13.) For the reasons discussed *supra*, this Court again concludes that the record is ambiguous with respect to Plaintiff's employment status following her early departure from work.  Viewing the evidence in the light most favorable to the Plaintiff, this Court presumes that Plaintiff did not intend to quit when she left work early and that Defendant terminated Plaintiff over the phone on June 7, 2013.  (Doc. # 1 at 8.)

Defendant argues in the alternative that Plaintiff's claim does not meet the prima facie standard for wrongful discharge because she fails to identify any facts which "tend to show that [Defendant] decided to discharge [Plaintiff], even in part, **because** she was disabled."  (Doc. # 29 at 14) (emphasis in original).  In her complaint, Plaintiff leans on the temporal connection between her mother's alleged initiation of the interactive process and Plaintiff's subsequent termination a matter of days later.  (Doc. # 1 at 12.) This Court concludes Plaintiff has alleged a fact sufficient to make out a prima facie claim for wrongful discharge.  *See Selenke*, 248 F.3d at 1260 (Plaintiff's discharge within a month of a request for accommodation was evidence indicating at most that she had established a prima facie case for wrongful discharge); *Butler*, 172 F.3d at 752 (noting that protected conduct closely followed by adverse action may justify an inference of retaliatory motive).

In accordance with the *McDonnell Douglas* burden shifting framework, Defendant articulates its legitimate, nondiscriminatory reason for termination, namely that Plaintiff walked off the job.  (Doc. # 29 at 14.)  In order for the wrongful discharge claims to survive summary judgment, Plaintiff must now demonstrate that Defendant's proffered reason for termination is pretextual.  See *Conner*, 121 F.3d at 1396.  Plaintiff deploys three arguments to show pretext, all of which will be addressed in turn, and none of which this Court finds persuasive.

First, Plaintiff addresses Defendant's policy to terminate any employee that abandons work.  (Doc. # 31 at 15.)  Defendant acknowledges its policy that any employee leaving work without permission will be terminated, but notes an exception for anyone experiencing a "life-threatening emergency or something." (*Id.*)  Plaintiff argues that Defendant's failure to include in the exception employees experiencing severe distress brought on by a disability somehow suggests that Defendant's decision to terminate Plaintiff for walking off the job is a pretextual justification and that Defendant was actually motivated by discriminatory intent.  That argument is without merit.  In reality, the existence of the policy demonstrates that Defendant treated Plaintiff exactly how it would treat any other employee that walked off the job under circumstances that did not implicate a life threatening emergency.  This Court agrees with Plaintiff's related declaration that she need not show as a precondition to pretext other similarly situated employees were treated differently after walking off the job. (Doc. # 31 at 16); *See Doebele  v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1137 (10th Cir. 2003) (noting pretext may be shown by a variety of evidence and no one type of evidence is required).

However, it is also true that failure to present probative evidence that the plaintiff was in fact treated differently than those similarly situated may weigh in favor of granting summary judgment. *Doebele*, 342 F.3d at 1137.

Second, Plaintiff argues that Defendant's failure to adequately investigate the offense for which she was terminated suggests that its justification is pretextual. Plaintiff relies on *Smothers v. Solvay Chemicals, Inc.*, which holds that an employer's proffered reason for termination may be "undermined by evidence the company failed to adequately investigate the offense for which it purportedly fired the plaintiff." 740 F.3d 530, 539 (10th Cir. 2014). That case is clearly distinguishable on the facts. In *Smothers*, the plaintiff was terminated after exhibiting behavior characterized as "violent," "hostile," and "aggressive." *Id*. at 542. The behavior was reported to supervisors by another employee, but the plaintiff emphatically denied the characterization of his behavior. After failing to investigate the true nature of the disputed behavior, the employer terminated the plaintiff. In this case, the nature of the offense that led to Plaintiff's termination – walking off the job – is not in dispute. Plaintiff admits in her complaint that she left work early and to the extent that Defendant was required to investigate the nature of an offense that was not in dispute, Al Austin confirmed Plaintiff's early departure for reasons not related to a life threatening medical emergency when he spoke to Plaintiff's mother on the day of the incident. (Doc. 1 at 7.)

Third, Plaintiff argues Defendant's justification for her termination is pretextual because the proffered explanations for its actions are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are]

unworthy of belief."  (Doc. # 31 at 17); *Johnson*, 594 F.3d at 1211.  In support of this

argument, Plaintiff points to conflicting evidence in the record with respect to the issue

of whether she voluntarily quit or was terminated by Defendant.  (*Id*. at 17.)  This Court

has already acknowledged the considerable ambiguity concerning the status of

Plaintiff's employment following her early departure from work.  While it is true

Defendant first argues that Plaintiff voluntarily quit, the proffered explanation for

discharge it raises in the alternative has been perfectly consistent: Plaintiff was

terminated for leaving work early.

In consideration of the foregoing, Plaintiff has failed to rebut Defendant's

proffered reason for her termination with a factual showing that the explanation is

incoherent, weak, inconsistent, or contradictory, such that a rational factfinder could

conclude it is unworthy of belief.  This Court therefore concludes that Defendant's

explanation is not pretextual, but a legitimate, nondiscriminatory justification for

terminating Plaintiff.  Accordingly, this Court grants Defendant's motion for summary

judgment on Plaintiff's third and seventh claims for wrongful termination in violation of

the ADA and CADA.

## C.    PLAINTIFF'S FOURTH AND EIGHTH CLAIMS: UNLAWFUL RETALIATION IN VIOLATION OF THE ADA AND CADA

To establish a prima facie case of unlawful retaliation under the ADA, Plaintiff

must show: (1) that she engaged in protected opposition to discrimination, (2) that a

reasonable employee would have found the challenged action materially adverse, and

(3) that a causal connection existed between the protected activity and the materially

adverse action. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007). With respect to element three, a retaliatory motive may be inferred when an adverse action closely follows protected activity. *Piercy v.* Maketa, 480 F.3d 1192, 1198 (10th Cir. 2007). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006). If the employer does so, the burden shifts back to the plaintiff to show that the employer's reason is pretextual. *Id*. (citing *McDonnell Douglas*, 411 U.S. 792, 802 (1973)).

Defendant argues Plaintiff cannot establish that she engaged in protected activity or, in the alternative, that a causal nexus existed between an alleged complaint of discrimination and her discharge. (Doc. # 29 at 15.) This Court already found sufficient facts pointing to a dispute on the issue of whether Plaintiff initiated an ADA "interactive process" when her mother allegedly reported Plaintiff's disability and requested accommodation during the conversation with Al Austin. Requests for accommodation are undoubtedly protected activity under the ADA. *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007). To demonstrate a causal nexus, Plaintiff again leans on the temporal relationship between her alleged complaint and subsequent discharge days later. (Doc. # 31 at 20.) Because "a retaliatory motive may be inferred when an adverse action closely follows protected activity" (*Piercy*, 480 F.3d at 1198), this Court finds Plaintiff has raised sufficient facts to establish a prima facie claim for unlawful retaliation.

In accordance with the *McDonnell Douglas* burden shifting framework, Defendant again articulates its presumptively legitimate and nondiscriminatory reason for terminating Plaintiff, namely that she walked off the job.  (Doc. # 32 at 10.)  The burden now shifts back to Plaintiff, and requires a showing that the proffered justification is pretext.  Plaintiff's response is a *pro forma* recitation of the arguments she deployed to demonstrate pretext in relation to her unlawful termination claims (Doc. # 31 at 20), all of which were addressed in detail *supra* and none of which were persuasive.  Because Plaintiff fails to raise any evidence which could lead a rational factfinder to conclude that Defendant's proffered explanation for her termination is pretextual, this Court grants Defendant's motion for summary judgment on claims four and eight for unlawful retaliation under the ADA and CADA.

## D.  PLAINTIFF'S FIRST AND FIFTH CLAIMS: UNLAWFUL HARASSMENT IN VIOLATION OF THE ADA AND CADA

Courts have applied a modified parallel Title VII methodology to evaluate causes of action based on a harassing or hostile work environment brought under the ADA.  *See Fox v. General Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 1999); *Peru v. T-Mobile USA, Inc.*, 897 F. Supp. 2d 1078, 1090–91 (D. Colo. 2012).  In order to make out a prima facie case of unlawful workplace harassment under the ADA, Plaintiff must show: (1) she is a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment;

and (5) some factual basis exists to impute liability for the harassment to the employer. *Id.*

A showing of pervasiveness requires more than a few isolated incidents of disability-based animosity. *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).  "Instead, there must be a steady barrage of opprobrious . . . comments." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005).  Although the pervasiveness and severity inquiry is usually a question of fact, *see O'Shea v. Yellow Tech. Servs.*, Inc. ., 185 F.3d 1093, 1098 (10th Cir.1999), summary judgment is appropriate if the alleged harassment was not sufficiently pervasive or severe to support a hostile work environment claim.  *See, e.g., Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365–66 (10th Cir. 1997) (concluding five separate incidents of allegedly offensive comments either directed at the plaintiff or made in her presence were not sufficiently pervasive to support a hostile work environment claim); *Morris v. City of Colorado Springs*, 666 F.3d 654, 666 (10th Cir. 2012) (determining there was insufficient evidence for a jury to find that the alleged harassment was pervasive); *cf. Chavez*, 397 F.3d at 833–36 (finding sufficient evidence of a hostile work environment based upon extensive sexual discrimination where there was evidence that the plaintiffs had been subjected both to a "number of gender-based incidents" occurring over a long period of time, including sexual propositions, and "multiple incidents of hostile and physically threatening conduct").

Plaintiff points to the following incidences of alleged harassment during her two days of employment with Defendant:

- Ms. Montague told Plaintiff that her disability was "all in her head."

- Ms. Montague told Plaintiff she should "get off pills" and that Ms. Montague would "fix" her.
- After Plaintiff disclosed her Tourette's Syndrome, Ms. Montague asked questions like "Does that mean you say 'shit' and 'asshole' all the time?"
- After learning of Plaintiff's anxiety disorder, Ms. Boudreau jumped up and down in the elevator to make it shake.
- Ms. Montague denied Plaintiff's requests for more direction regarding Ms. Boudreau's work duties and expectations.

(Doc. # 1 at 6.)  Even if one assumes that each of these acts are the product of discriminatory animus and not the ignorance of Defendant's employee, this Court determines that Plaintiff has simply failed to raise sufficient evidence for a rational factfinder to conclude that the harassment was so pervasive as to alter a term, condition, or privilege of Plaintiff's employment.  Plaintiff also fails to articulate with specificity why the relatively benign antics of Ms. Boudreau are sufficiently severe.  This Court has conducted a thorough review, uncovering a litany of cases implicating more egregious conduct where the alleged harassment was insufficiently severe to be actionable as discrimination.  *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246–47 (11th Cir. 1999) (collecting cases determining that harassing conduct was not sufficiently sever to be actionable discrimination under Title VII).

Defendant raises a number of arguments addressing whether Ms. Boudreau's conduct even rises to the level of harassment, and if it does, whether that harassment was actually directed at or driven by Plaintiff's disability.  This Court need not address those arguments and declines to do so.  After reviewing the evidence in the light most favorable to the Plaintiff and assuming *arguendo* that Ms. Boudreau's conduct both constitutes harassment and is motivated by discriminatory intent, this Court concludes

the harassment was neither pervasive nor severe, such that it altered a term, condition, or privilege of Plaintiff's employment.  Accordingly, this Court grants Defendant's motion for summary judgment on claims one and five for unlawful harassment under the ADA and CADA.

## IV.   **CONCLUSION**

Based on the foregoing, the Court ORDERS that Defendant's Motion for Summary Judgment (Doc. # 29) is GRANTED IN PART AND DENIED IN PART.  The Motion is granted insofar as Plaintiff's claims for unlawful termination (Claims 3 and 7), unlawful retaliation (Claims 4 and 8), and unlawful harassment (Claims 1 and 5) are DISMISSED WITH PREJUDICE.  Because there are disputed issues of material fact relating to Plaintiff's claims for unlawful failure to accommodate a disability (Claims 2 and 6), the Motion is denied as to these claims.

DATED:  January 27, 2016

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge